UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN HEARD,

        Plaintiff,

                                      Case No. 11-cv-13051
vs.                                  HON. GERSHWIN A. DRAIN

BOARD OF TRUSTEES OF THE
JACKSON COMMUNITY COLLEGE,
*et al.*,

        Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#18]

### I.    Introduction

Plaintiff, Karen Heard, filed the instant action on July 14, 2011, alleging that Defendants, Board of Trustees of the Jackson Community College and Jackson Community College (collectively "JCC") violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, as well as breached a collective bargaining agreement ("CBA") by refusing to adhere to the CBA's terms and terminating Plaintiff without just cause. Plaintiff brings claims of race discrimination, hostile work environment, retaliation and discrimination based on race and sex stereotyping under Title VII.

Presently before the Court is JCC's Motion for Summary Judgment, filed on August 2, 2012. Plaintiff filed a Response in Opposition to JCC's Motion for Summary Judgment and JCC filed a Reply brief in support of its Motion for Summary Judgment. A hearing was held on December 18, 2012. For the reasons that follow, the Court denies JCC's Motion for Summary Judgment.

## II.        Factual Background

Plaintiff was hired by JCC in December of 2003 to serve as Circulation Coordinator in the JCC library.  At that time, Plaintiff's supervisor was Dean Charlotte Finnegan.  Finnegan completed three probationary period reviews during the initial ninety days of Plaintiff's employment at JCC.  All of Finnegan's reviews were marked "satisfactory progress."  *See* Plf.'s Resp., Ex. 1.  Generally, the reviews show that Finnegan believed  Plaintiff was performing well, commenting that she "is organized and detail oriented" and  takes "initiative in planning programs and in getting to know other staff and their program goals."  *Id.*

While Finnegan was initially "generally impressed with" Plaintiff's work, by October of 2004, she had become increasingly frustrated with Plaintiff's work.  On October 26, 2004, Plaintiff was in the testing center in the library when a student came in to take a test that she had made special arrangements with her instructor to take after the deadline for taking the test.  *See* Defs.' Mot. for Summ. J., Ex. D.   When the student arrived at the testing center, the student-employee working there would not let her take the test and he was very rude in his demeanor.  Plaintiff was standing there and observed the rude behavior, but did nothing to rectify the situation.  *Id.*  Finnegan drafted an email to Plaintiff stating:

> Karen–I've had it.  I've tried to see your side and the faculty side . . . but I feel like I can't be gone at all for fear that people can't handle simple polite behavior to each other.
> 
> *                 *                 *
> 
> Fix this.  Call the student, be nice, apologize, and make arrangements for her to come in.
> 
> *                 *                 *
> 
> I want no more calls or e-mails or hall conversations with faculty or staff telling me they feel they are treated rudely[.]

*Id.* Finnegan's frustration with Plaintiff intensified.  Over the six year period during which Finnegan

-2-

was Plaintiff's supervisor, she issued multiple written warnings/disciplines to Plaintiff. She also regularly had verbal coaching or warning sessions with Plaintiff concerning Plaintiff's performance, sometimes several times a month. *Id.*, Ex. C, Dep. Tr. of Charlotte Finnegan at 193-96. Finnegan found Plaintiff's unwillingness to work on these performance issues very frustrating. *Id.* On June 10, 2009, Finnegan prepared Plaintiff's performance evaluation for the period of July 1, 2008 through June 30, 2009; she evaluated Plaintiff as performing "below expectations" in eight out of ten evaluated categories.

On October 25, 2007, Plaintiff filed a charge of racial discrimination against JCC with the Michigan Department of Civil Rights ("MDCR") based on unwarranted discipline and race discrimination. *See* Plf.'s Resp., Ex. 2, Dep. Tr. of Karen Heard at 22.

Thereafter, on or about September 29, 2008, a picture of a black bear sitting at a lunch table was anonymously left on Plaintiff's desk and in the library staff lunch room. The commentary accompanying the picture stated:

> Animals that were formally self-sufficient are showing signs of belonging to the Democratic Party . . . as they have apparently learned to just sit and wait for the government to step in and provide for their care and sustenance. This photo is of a Democrat black bear in Montana nicknamed 'Bearack Obama.'

Plaintiff did not immediately report this incident to anyone at JCC, but sometime in 2008 she informed Ellen Young, her union representative, as well as showed her the photograph. Plaintiff felt hurt, offended, and embarrassed, and did not report the incident to Human Resources because she felt that nothing would be done to remedy the situation since she had previously reported that she had been treated differently because of her race and nothing was done about it. *See* Plf.'s Br., Ex. 2, Dep. Tr. of Karen Heard at 27-28. Plaintiff believes that JCC's administration learned of the photograph because she mentioned it in a Legal Affairs complaint, as well as brought to Diane

Fenby's, the Legal Affairs and Compliance Officer at JCC, and Valerie Schuette's, Director of Human Resources, attention during an Equal Employment Opportunity Commission ("EEOC") mediation. *Id.* at 24. The mediation took place sometime after 2008. *Id.* However, JCC points out that Plaintiff's legal affairs complaint did not mention this photograph. Further, Fenby, Schuette, Nancy Miller and David Burns testified that they had not seen the photograph until after the lawsuit was filed.

In June of 2009, Burns was made Library Director in the JCC library. Plaintiff believed herself to be Finnegan's personal "whipping boy" and that Finnegan hand picked Burns for the position so that he could continue the "witch hunt." *See* Defs.' Mot. for Summ. J., Ex. F, Dep. Tr. of Karen Heard at 105. Defendant denies that Finnegan was involved in the decision to promote Burns to the position of Library Director, however Burns testified at his deposition that he learned of the position through Finnegan, who "offered it to me." *See* Plf.'s Resp., Ex. 1, Dep. Tr. of David Burns at 34. Also in 2009, Assistant Dean Miller was hired by JCC. Miller's position involved, among other duties, supervision of the library.

Within three weeks of Burns taking the position as Library Director, Plaintiff emailed her union representative, Ellen Young, complaining about deficiencies in the manner in which Burns was running the library. *See* Defs.' Mot. for Summ. J., Ex. F, Dep. Tr. of Karen Heard at 106-07. Plaintiff again sent correspondence to Young on August 13, 2009, complaining that Burns repeatedly held unscheduled meetings and spent too much time playing computer games. *Id.* at 108-09. On September 21, 2009, Plaintiff emailed another employee who apparently was also experiencing difficulty with Burns's management style, stating: "You know perfectly well what his problem is –EGO! Now, we just need to develop a strategy to get rid of it." *Id.*, Ex. H.

-4-

Plaintiff asserts that during Burns tenure as Library Director, he made several disparaging remarks both to Plaintiff and in her presence. For instance, in August of 2009, Burns asked Plaintiff if she wanted to be "the Circulation Supervisor or a clerk." Additionally, during a meeting with JCC library staff, Burns made a joke about his daughter and her friend attending a Halloween costume party. He indicated that they were attending the party as Kanye West and Taylor Swift. Plaintiff was the only African American at the meeting.

Plaintiff further argues that Burns had negative interactions with African American students. One incident involved Burns changing the channel on the television, even though an African American student was currently watching a program. Plaintiff had to intervene because the student was upset. At his deposition, Burns testified that:

Q.    Okay.  Do you recall a confrontation between you and a female black student in the coffee shop in the library?
A.    Yes.
Q.    Okay.  This related to changing of the TV or something like that?
A.    Yes.
Q.    Okay.  Can you tell me what happened there?
A.    I was in the coffee shop, some other people were, too.  The TV was on and no one appeared to be watching it with any intent, and it was tuned in to Jerry Springer.
Q.    Okay.
A.    So I turned the channel.
Q.    Okay. What did you turn the channel to?
A.    ESPN or something.
Q.    Okay.  So you changed the channel to sports as your recollection?
A.    I couldn't find a white person's network, no.  I turned it to ESPN just as something benign that we could look at.
Q.    Okay. I'm sorry.  You were trying to find a white person's network; is that–
A.    I was kidding there.
Q.    Oh, okay.
A.    That fell kind of flat. Sorry.
Q.    Okay.  All right.  The student I take it objected to you changing the channel?
A.    Oh, well, seriously she went ballistic.
Q.    Okay.  And tell me what she did.
A.    I don't recall her words, but she was complaining that I had –about my actions.

*Id.*, Ex. 4, Dep. Tr. of David Burns at 104-05.

In September of 2009, Burns hired his daughter to come to JCC's library and conduct training that would otherwise have been within the purview of Plaintiff's job duties. At his deposition, Burns indicated that he brought his daughter to JCC to perform Plaintiff's job duties because "Karen's training wasn't working." *Id.*, Ex. 4 at 126-28. When asked why he had not discussed this with Plaintiff, he responded "I didn't know she was going to cry about it." *Id.* Plaintiff filed a grievance over this issue, which Burns denied. He testified that Plaintiff filed grievances concerning "everything I did." *Id.* at 129. Therefore, her grievance "mean[t] nothing." *Id.* at 130.

On October 20, 2009, Plaintiff filed a complaint with Diane Fenby. Plaintiff complained that "[t]he moral character of the library and the college is being threatened by David Burns." *Id.*, Ex. I. She further maintained that his behavior "places the college at risk due to his discriminatory statements and actions. He creates a hostile work environment for his employees by using his authority to harass, cause alarm in and retaliate against those under his supervision." *Id.* Plaintiff explained that Burns's conduct had created a disturbance in the library due to his poor interactions with minority students." *Id.* Plaintiff further described Burn's retaliatory conduct against her, specifically by "piling on more work for me to do." *Id.* Lastly, Plaintiff complained that Burns had hired his daughter to train the IT consultants how to check out laptops and computer software using the library's new system. These responsibilities were part of Plaintiff's job duties, yet Burns "totally bypassed me in order to employ his daughter which is a violation of the JCC Nepotism policy and the union contract." *Id.*

After Fenby conducted an interview with Plaintiff concerning the allegations in her October

10, 2009, complaint Plaintiff filed an addendum on November 11, 2009, which raised additional issues that were not included in the original complaint.  In the addendum, Plaintiff complains of disparate treatment compared with a Caucasian employee, Deborah Moyer, such as, the different, and overly burdensome procedure that was required of Plaintiff when she called in sick.  Moyer had to contact her direct supervisor only, whereas Plaintiff was required to contact her direct supervisor, and at least two other individuals. Additionally, Moyer and Plaintiff were treated differently with respect to requesting time off, and obtaining approval for time off.  Plaintiff further complained that Moyer was originally hired to provide back-up support for Plaintiff, but that this rarely happened.

Plaintiff argues that Fenby conducted a less than thorough investigation of her complaint. Prior to receiving final findings on the original complaint, Plaintiff filed three additional Legal Affairs complaints, alleging retaliatory discipline by Finnegan, Miller and Burns.  Fenby did not meet with anyone to investigate these additional claims, rather Fenby merely reviewed them.  *Id.* at 73-74.  In December of 2009, Fenby completed her investigation.  On December 21, 2009, she drafted a letter to Plaintiff stating:

> I have completed my investigation into your complaint alleging that you have been subjected to discrimination.  I reviewed the documentation you provided and talked with many of your colleagues. I found no evidence that supports this allegation.  At this point I consider the investigation closed however if you have additional evidence that you believe I should consider please let me know.

*Id.*

During her employment, Plaintiff received several disciplines, which she claims were discriminatory, retaliatory and in violation of the just cause provision of the collective bargaining agreement.  Plaintiff argues that she was repeatedly disciplined for following JCC's written procedures.  Defendant counters that none of the disciplinary actions were for following procedure.

-7-

For instance, on November 9, 2009, Miller disciplined Plaintiff for violating "JCC values" such as service and professionalism. *Id.*, Ex. 4. This incident involved a student experiencing difficulty in reserving private rooms in the library. *Id.* When the student tried to resolve the problem with Plaintiff, Plaintiff "stood with her back to me, acting like she was busy, and said 'uh huh' but she took no action." *Id.* Burns testified that Plaintiff was not disciplined for violating procedures, but instead was too rigid in her compliance with JCC procedures. *Id.* at 158-59. Burns could not identify how Plaintiff would know when it was appropriate to strictly follow procedures versus when a more lenient application of JCC procedures was warranted. *Id.*

On October 6, 2010, the Director of Human Resources, Stacy Mellon, issued Plaintiff a written discipline regarding scheduling a private room in the library, which was performed by Moyer, even though this was normally Plaintiff's responsibility. Because the room had already been reserved for another group of students, Plaintiff moved Moyer's reservation to another room and informed Moyer or another employee of her action. Mellon never spoke with Moyer about the incident, failed to determine who had authority to schedule the rooms, and disciplined Plaintiff, but not Moyer.

In addition to the issuance of multiple written disciplines, Plaintiff was also subjected to directives that Caucasian employees were not. In 2009, Plaintiff filed a grievance over the fact that Burns continually interrupted her lunch breaks. *See* Plf.'s Resp., Dep. Tr. of David Burns at 109-11. As a result, Burns and Schuette directed Plaintiff not to eat her lunch in her office. Burns required Plaintiff to vary her hours and submit a flexible schedule to him in advance. The reason given for this was so that Plaintiff would be working during the hours that the testing lab was open. Burns did not attempt to vary Moyer's hours, even though the testing lab was part of Moyer's job

-8-

responsibilities. *Id.* at 130-36.

On September 28, 2010, the MDCR concluded its investigation of Plaintiff's complaint of discrimination against JCC. Shortly thereafter, on October 4, 2010, Schuette, sent a memorandum to Plaintiff informing her that she was to be involuntarily transferred to a different department, which was a secretarial position. The reason given for the transfer was for alleged customer service complaints, yet the position she was transferred to required "strong customer service skills." After Plaintiff protested the transfer and claimed it was retaliatory, the transfer was postponed.

When Plaintiff returned from pre-approved personal leave on October 6, 2010, she was informed by a student employee, Carl Strachn, that Burns had directed him to complete a number of library card applications for students at JCC's Hillsdale Center. According to Strachn, the applications were missing a copy of the respective student's driver's license. This was outside of JCC's procedure, however Burns wanted the students to have accounts so they could check out needed materials. Strachn did not finish processing all of the applications prior to the end of his shift, and he turned over the completion of the task to another student, Lindsey Wilson. When Strachn informed Plaintiff of what he had done at the direction of Burns, Plaintiff became visibly frustrated, and told him that the accounts would have to be voided. Later that same day, Plaintiff requested that Strachn prepare a written statement detailing Burns's actions. *See* Defs.' Mot. for Summ. J., Ex. N, Dep. Tr. of Carl Strachn at 23-27.

Also on October 6, 2010, Plaintiff sent email correspondence to Marion VanLoo regarding Burns's decision to permit the issuance of the Hillsdale students library cards without their driver's license information. *Id.*, Ex. U. VanLoo responded: "How much of a sling will our behinds be in if we go against and ORDER and ship them back to Hillsdale for ID?" *Id.* Plaintiff then wrote to VanLoo, "I am more inclined to have these sent back to the center for completion." *Id.*

-9-

Stachn felt uncomfortable with Plaintiff's request to document Burns's actions, but prepared a written statement. *Id.* However, a week later, Strachn informed Stacey Mellon of what Burns's had instructed him to do and that Plaintiff informed him that the applications would need to be voided. *Id.* at 28-33. Thereafter, Mellon instructed Schutte to contact Burns and determine if the Hillsdale students had library cards. After investigating the matter, Burns informed Mellon that none of the Hillsdale students had valid library cards, the profile for the Hillsdale students' accounts had been changed to a "WB," or withdrawn borrower status.

On October 21, 2010, Schuette sent an email to Plaintiff to "understand what Karen had done and why she had done it." *Id.*, Ex. Q; and Ex. R, Dep. Tr. of Valerie Schuette at 150. Schuette's email asked Plaintiff "Are you responsible for the fact that these applications have been voided?" Plaintiff responded "No. This statement is not completely accurate." Plaintiff also denied instructing another individual to void the accounts. *Id.* Upon receipt and review of Plaintiff's response, Schuette requested a meeting with Plaintiff and her union representative. The meeting was scheduled for October 25, 2010.

At the meeting, Plaintiff informed Schuette that the library cards for the Hillsdale students were defective and, consequently, she voided the cards. Plaintiff explained that she had to create new library cards and that they had been sent to the students "weeks ago." After the meeting, Schuette informed Burns that Plaintiff had remedied the problem and that the matter was resolved. Burns indicated to Schuette that this was not true and that Plaintiff had recreated the Hillsdale students' library cards/accounts just prior to the October 25, 2010 meeting. After contacting the Hillsdale students, it was confirmed that none of the students had received their new library cards. Thereafter, Schuette contacted Andy Lane, an Information Technology employee, who confirmed that the accounts had been recreated on the morning of October 25, 2010. Lane also informed

Schuette that altering the students' accounts to "WB" status was not the typical procedure for replacing a library card with a defective barcode.  By changing the profile to "WB" status, the borrowing privileges of all of the Hillsdale students were suspended.

Schuette scheduled a second meeting with Plaintiff and her union representative.  This meeting took place on November 3, 2010.  Schuette confronted Plaintiff with the new information she had obtained from Lane.  Plaintiff indicated that she could not respond because she did not have her notes, however she declined to go to her office to retrieve the notes when Schuette offered her an opportunity to do so.  Plaintiff maintained that she could not recall the events leading up to the students' accounts being voided, therefore she could not confirm or deny Schuette's new information.

On November 10, 2010, Schuette sent a memorandum to Plaintiff.  The memorandum was a written summary of Schuette's investigation and notification that Plaintiff was being terminated effective immediately.  Schuette made the decision to terminate Plaintiff after consultation with JCC's President, without input from Burns or Miller.  JCC maintains that it terminated Plaintiff's employment because she (a) intentionally voided the Hillsdale students library cards without Burns's approval or knowledge and (b) made false/misleading statements during JCC's investigation of the incident.  After Plaintiff was terminated, her job duties were reassigned to Moyer, who, at least initially, received a pay increase for the work.  While JCC maintains that it terminated Plaintiff's employment based on the events occurring in October and November of 2010, at least as early as July of 2009, Burns expressed his desire to terminate Plaintiff in email correspondence to Miller:

> There will be other opportunities.  Is there any doubt?  Just asking her to do reserves the way they are supposed to be done–the way she is supposed to be doing them–will be a great test.  If we work with Karen and she comes around, great.  If she doesn't we will have done our jobs, and sometime next year (or even earlier), she will be making the transition to other employment.

-11-

That's the way I see it. I'll have some more later. Thanks for listening.

*Id.*, Ex. 6, Dep. Tr. of David Burns, Ex. 72.

### III.   Law & Analysis

### A.   Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

-12-

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B.   Title VII

#### 1.   Race Discrimination

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Where there is only circumstantial evidence of race discrimination, a plaintiff must use the *McDonnell Douglas* burden shifting analysis to establish a prima facie case of discrimination by showing: (1) that she belongs to a protected class; (2) she was subjected to an adverse employment action; (3) she was qualified for the job; and (4) she was treated differently from similarly situated employees from a non-protected class or replaced by a person not a member of her protected class. *McDonnell Douglas v. Green, 411 U.S. 792 (1973)*.

If plaintiff proves a prima facie case, the burden of persuasion shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. Even though the burden of going forward is on the defendant once a plaintiff has established a prima facie case, the ultimate burden of persuasion never shifts from the

-13-

plaintiff. *Id*.  Once the employer carries this burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination.  *Id*.; *Ang v. Proctor & Gamble Co.*, 932 F. 2d 540, 548 (6th Cir. 1991).  The plaintiff may meet this burden by showing: 1) that the stated reasons had no basis in fact; 2) that the stated reasons were not the actual reasons; or 3)  that the stated reasons were insufficient to explain the employer's action.  *Wheeler v. McKinley Enters.*, 937 F. 2d 1158, 1162 (6th Cir. 1991).  The burden of persuasion always, remains, however, with the plaintiff.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

For purposes of the present motion, JCC concedes that Plaintiff can establish a prima facie case.  However, JCC argues that it had a legitimate, nondiscriminatory reason for Plaintiff's termination.  JCC contends that Plaintiff was terminated because she (1) intentionally voided the Hillsdale students' library cards/accounts, without  Burns's permission or knowledge and (2) she made false and/or misleading statements during JCC's investigation of the incident.  JCC further argues that Plaintiff has failed in her burden to establish that Defendant's proffered reasons were pretext for discrimination.

Plaintiff counters that JCC improperly relies on only her termination as the adverse employment action.  Plaintiff maintains that the treatment she received throughout her employment was discriminatory.  Plaintiff claims that similar to the facts in *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 395 (6th Cir. 2008), JCC's reasons for terminating Plaintiff were entirely subjective, and therefore it is inappropriate for the Court to assume their truth.   Plaintiff maintains that JCC's determination that Plaintiff was not truthful during the investigation was entirely subjective, and therefore raises a question of fact as to its reasonableness.

In this case, the Court finds that Plaintiff has presented sufficient evidence for a reasonable

-14-

jury to infer that JCC's proffered reason for terminating Plaintiff may merely be pretext for discrimination. Similar to the facts in *White*, the reasons given for Plaintiff's termination were inherently subjective, thus it is inappropriate for the Court to conclude as a matter of law that JCC's decision to terminate Plaintiff was based on a legitimate, nondiscriminatory reason. In light of all of Plaintiff's evidence, specifically, but not limited to, the disparate treatment she received compared to other Caucasian employees, Burns's July 2009 email stating that "sometime next year (or even earlier), she will be making the transition to other employment," and the numerous and vague written disciplines for violating JCC values, a reasonable jury could find JCC's decision to terminate Plaintiff as suspect.

Alternatively, even if race was not the sole motivating factor behind JCC's adverse employment decision, Plaintiff has demonstrated that a question of fact remains on the basis of a mixed-motive discrimination theory. Under a mixed-motive theory, Plaintiff must show that Defendant "engaged in an unlawful employment practice by 'demonstrating that race, color, religion, sex, or national origin was a motivating factor for the employment practice, even though other factors also motivated the practice.'" *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 395 (6th Cir. 2008). The *White* court held that the *McDonnell Douglas* burden shifting approach is inapplicable to mixed-motive discrimination claims, instead a plaintiff raising a mixed-motive discrimination claim must "produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *Id*. at 400 (internal quotations omitted).

Plaintiff's burden "is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's

claim." *Id*.  Plaintiff is not required "to eliminate or rebut all the possible legitimate motivations of the defendant as long as the plaintiff can demonstrate that an illegitimate discriminatory animus factored into the defendant's decision to take the adverse employment action." *Id*. at 401.  Thus, to defeat Defendant's Motion for Summary Judgment, Plaintiff "must be able to point to evidence in the record on which a jury could reasonably conclude that (1) [Defendant] took an adverse employment action against [Plaintiff], for which (2) [Plaintiff]'s race was a motivating factor." *Id*. at 402.  "As inquiries regarding what actually motivated an employer's decision are very fact intensive, such issues will generally be difficult to determine at the summary judgment stage and thus will typically require sending the case to the jury." *Id*.

The Court concludes that many questions of fact exist as to whether race was a motivating factor behind JCC's adverse employment actions.  Plaintiff was the only African American employee working in the library, and she was treated differently than her similarly situated counterparts, including being prohibited from eating at her desk, being required to produce a varied work schedule to cover other employees' responsibilities, specifically the testing lab, and having myriad job duties added to her responsibilities.  Furthermore, a racially offensive photograph was anonymously placed on her desk, and she was required to comply with more stringent requirements than other employees for requesting vacation time.  Finally, when Plaintiff filed complaints with JCC, her complaints were never taken seriously or adequately investigated.  For all of these reasons, JCC is not entitled to summary judgment on Plaintiff's race discrimination claim.

### 2.   Retaliation

In order to establish retaliatory discharge, Plaintiff must show: (1) she engaged in an activity protected by Title VII; (2) the exercise of her civil rights was known to the employer; (3) the employer thereafter took an employment action that was adverse to the plaintiff; and (4) there was

a causal connection between the protected activity and the adverse employment action. *Cantita v. Yellow Freight System*, 903 F.2d 1064, 1066 (6th Cir. 1990). If the Plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its actions. *Id.* Thereafter, Plaintiff must demonstrate that the proffered reasons are pretext for the employment decision. *Id.*

JCC argues that Plaintiff cannot establish a causal connection between her protected activity and her termination. In order to demonstrate a causal connection between protected activity and an adverse employment action, Plaintiff must show that the protected activity was a "significant factor" in the adverse action. *Polk v. Yellow Freight System, Inc.*, 876 F.2d 527, 531 (6th Cir. 1989). JCC maintains that all of Plaintiff's complaints were filed months or years prior to her termination. Further, even if Plaintiff could establish a causal connection, she cannot demonstrate that JCC's legitimate, nondiscriminatory reason for terminating her was pretext for discrimination.

Plaintiff counters that she is not only claiming adverse employment action in her termination but also the other acts of JCC in disciplining her and treating her differently than similarly situated employees.

Plaintiff has satisfied the first and second element of her retaliation claim. She filed a complaint with the MDCR and the EEOC concerning discrimination and disparate treatment. She also filed complaints with the college's Legal Affairs Department, as well as grievances alleging discrimination and retaliation. Further, prior to Plaintiff's termination, she was given additional work assignments outside of her normal job duties and disciplined for enforcing JCC's procedures too rigidly. The Court rejects JCC's contention that Plaintiff cannot establish a causal connection between her protected activities and the adverse employment action. The most obvious example of temporal proximity is when Schuette attempted to involuntarily transfer Plaintiff to another

-17-

department a few days after the MDCR dismissed her complaint.  Thus, the Court finds that Plaintiff

has met her burden of establishing a prima facie case of retaliation.  Similar to Plaintiff's race

discrimination claim, the Court concludes that, viewing the evidence in the light most favorable to

Plaintiff, she has demonstrated there is a question of fact as to whether JCC's reason for terminating

her was pretext for discrimination.  JCC is not entitled to summary judgment on this claim.

### 3. Hostile Work Environment

To prevail on her hostile work environment claim, Plaintiff must demonstrate: (1) she is a

member of a protected group; (2) she was subjected to harassment; (3) the harassment was based

on her race; (4) the harassment was severe and pervasive; and (5) the defendant knew or should have

known about the harassment and failed to act.  *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502,

511 (6th Cir. 2011).  "With respect to the fourth element, whether an environment is hostile or

abusive can be determined only by looking at all the circumstances."  *Id.* (internal quotations

omitted).  This Court "must consider harassment by all perpetrators combined, rather than dividing

and categorizing the reported incidents."  *Id*. (internal quotations omitted).  Only harassment based

on the plaintiff's race may be considered however.  *Id*.

JCC argues that Plaintiff has identified only two incidents during her seven years of

employment that can arguably be considered racially motivated.  The first incident, involving the

photograph, occurred two years prior to her termination.  The second incident, involving Burns's

description of his daughter's and her friend's Halloween costume, occurred more than one year prior

to her termination.  Plaintiff never discussed with anyone at JCC that she was offended by Burns's

joke.  Defendant argues that these incidents involve mere offhand comments and were isolated, thus

they are insufficient to support a hostile work environment claim. In *Harris v. Forklift Systems, Inc*.,

510 U.S. 17, 23 (1993), the United States Supreme Court explained

-18-

> [W]hether an environment is hostile or abusive can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.*

JCC is incorrect in claiming that there were only two incidents involving offhand comments. Here, Plaintiff has presented evidence that she was continually criticized and disciplined for vague and subjective reasons, such as violating "JCC values" and enforcing library procedures too rigidly. She was treated disparately than her Caucasian colleagues and was the target of a racially offensive picture being left at her desk. JCC knew about the hostile work environment; Plaintiff filed numerous complaints concerning her treatment and unwarranted disciplines. In any event, the Sixth Circuit has found that "employers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment." *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). Burns was Plaintiff's supervisor and was directly responsible for much of the harassment.

JCC is likewise not entitled to summary judgment on Plaintiff's hostile work environment claim.

### 4.    Sex and Race Stereotyping

Under Title VII, where employment discrimination is based on the perception that the employee is not masculine enough or feminine enough, and she or he fails "to conform to gender stereotypes[,]" an employee may bring a discrimination claim based on stereotyping. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989). In order to set forth a prima facie case of discrimination based on stereotyping, a plaintiff must establish the same elements as those required

-19-

to state a prima facie case of race discrimination, the only difference is that the discrimination is based on a perceived or assumed stereotype. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004). Defendants argue that they have not found a single case discussing race stereotyping and in any event, Plaintiff has failed to put forth any evidence that she was discriminated against based on racial or gender stereotypes.

The Court finds that Plaintiff has put forth sufficient evidence on her claim of sex and race stereotyping. In *Chadwick v. Wellpoint, Inc.*, 561 F.3d 38 (1st Cir. 2009), the First Circuit Court of Appeals concluded that the plaintiff could proceed on her Title VII claim, characterizing her claim as "a 'sex- plus' claim. This denomination refers to the situation where an employer classifies employees on the basis of sex plus another characteristic." *Id.* at 43. In *Chadwick*, the plaintiff, a mother of four young children, maintained that she was not promoted based on her employer's discriminatory "sex-based stereotype that women who are mothers, neglect their jobs in favor of their presumed childcare responsibilities." *Id.* at 41.

There is evidence to support an inference that JCC discriminated against Plaintiff based on her sex plus her race. Specifically, there is evidence to suggest that JCC believed Plaintiff to be an angry black woman. This stereotype was discussed in an article published by Ferris State University entitled Jim Crow Museum of Racist Memorabilia:

> The Sapphire Caricature portrays black women as rude, loud, malicious, stubborn, and overbearing. This is the Angry Black Woman (ABW) popularized in the cinema and on television. She is tart-tongued and emasculating, one hand on a hip and the other pointing and jabbing (or arms akimbo), violently and rhythmically rocking her head . . . . She is a shrill nagger with irrational states of anger and indignation and is often mean-spirited and abusive. . . [S]he has venom for anyone who insults or disrespects her.

*See* Plf.'s Br., Ex. 10 at 1. Plaintiff argues that the angry black woman stereotype is the lens through which JCC viewed Plaintiff. For instance, Mellon testified about a meeting she attended with Burns

-20-

and Plaintiff.  Mellon described Plaintiff as "completely out of control."  Upon further questioning, Mellon stated that this out of control behavior consisted of silence, eye rolling, sighing, pushing back of her chair and turning of the head.  Burns testified similarly, claiming that there was always a negative subtext attached to Plaintiff's communications.  Burns explained this meant she would either scowl or grunt during his interactions with her.  Schuette testified that Plaintiff bullied her colleagues, that she was disrespectful and her tone was inappropriate, stating, "You know, it's in her posture, her behavior, her tone, the way that she would talk to me."

The Court concludes that there remains questions of fact as to whether JCC's adverse employment actions were based on discriminatory stereotyping.

### C.   Breach of Contract

The CBA at issue herein states in relevant part: "No bargaining unit member shall be disciplined without cause. The term 'discipline' as used in this Agreement includes . . . discharge . . . ."  Plaintiff maintains that the case law is clear, whether an employee is terminated for cause is a question of fact for the jury.  *See Toussaint v. Blue Cross and Blue Shield of Michigan*, 408 Mich. 579; 292 N.W.2d 880 (1980).  The Court agrees and rejects JCC's contention that there was ample cause to terminate Plaintiff's employment.  There remains questions of fact as to whether Plaintiff's termination was for cause, therefore JCC is likewise not entitled to summary judgment on this claim.

### IV.   Conclusion

For the reasons discussed above, JCC's Motion for Summary Judgment [#18] is DENIED.

SO ORDERED.

Dated: January 11, 2013

                              /s/Gershwin  A Drain_____
                              Gershwin A. Drain
                              UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

A copy of this Order was served upon attorneys of record by ordinary
mail or electronic mail.

s/Tanya R Bankston
Deputy Clerk